The Royle Co., et al. [1] v. Commissioner. Royle Co. v. Commissioner
Docket Nos. 72057-72061, 72063-72067, 83609-83661. mo. 1963-157.
United States Tax Court
T.C. Memo 1963-157; 1963 Tax Ct. Memo LEXIS 186; 22 T.C.M. (CCH) 747; T.C.M. (RIA) 63157; June 7, 1963
George T. Altman, 233 S. Beverly Dr., Beverly Hills, Calif., for the petitioners. John Schessler and Allan I. Blau, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: The respondent determined deficiencies in the petitioners' excess profits and/or income taxes and advised of transferee liability, as follows: Docket
Taxable Period
No.
Petitioner
Ended
Amount
72057
The Royle Co.
12/31/54
$ 1,474.70
72058
Destroyer Molds, Inc.
6/30/54
5,866.66
72059
Baltimore Molds, Inc.
6/30/54
5,499.99
72060
Submarine Molds, Inc.
3/31/54
7,634.02
72061
Lewis Glaser (Transferee of Hot Rod Molds, Inc.)
3/31/54
4,789.05
72063
Starfire Molds, Inc.
3/31/54
7,164.64
72064
Missouri Molds, Inc.
9/30/54
7,032.59
72065
Cougar Molds, Inc.
3/31/54
3,208.55
72066
307 Carrier Molds, Inc.
11/30/54
5,156.25
72067
Revell, Incorporated
6/30/54
155,809.03 [2]
83609
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
6/30/55
5,260.87
(Transferee of Baltimore Molds, Inc.)
6/30/56
5,358.98
6/30/57
5,417.91
83610
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
(Transferee of Bison 235 Molds, Inc.)
6/30/57
2,844.13
83611
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
5/31/55
2,780.73
(Transferee of 207 B-52 Bomber Molds, Inc.)
5/31/56
5,358.98
5/31/57
5,417.91
83612
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
11/30/56
$ 5,358.98
(Transferee of Bounty 327 Molds, Inc.)
6/30/57
2,801.43
83613
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
3/31/55
3,275.40
(Transferee of Cabin Cruiser Molds, Inc.)
3/31/56
2,395.61
3/31/57
5,217.72
83614
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
(Transferee of Canberra 230 Molds, Inc.)
2/28/57
3,365.85
83615
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
11/30/55
5,260.87
(Transferee of 307 Carrier Molds, Inc.)
11/30/56
5,358.98
6/30/57
5,417.91
83616
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
7/31/56
5,158.66
(Transferee of Cobra 222 Molds, Inc.)
6/30/57
3,212.91
83617
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
(Transferee of Connie 245 Molds, Inc.)
6/30/57
2,514.17
83618
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
3/31/56
1,202.70
(Transferee of Cougar Molds, Inc.)
3/31/57
5,116.08
83619
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
3/31/55
2,366.80
(Transferee of Cutlass Molds, Inc.)
3/31/56
5,358.98
3/31/57
5,417.91
6/30/57
1,595.58
83620
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
(Transferee of Cutter 338 Molds, Inc.)
6/30/57
4,451.60
83621
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
1/31/57
5,417.91
(Transferee of Delta 233 Molds, Inc.)
6/30/57
946.22
83622
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
6/30/55
5,260.87
(Transferee of Destroyer Molds, Inc.)
6/30/56
5,358.98
6/30/57
213.49
83623
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
(Transferee of Fighter 251 Molds, Inc.)
6/30/57
5,417.91
83624
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
(Transferee of Flying Cloud 344 Molds, Inc.)
6/30/57
3,823.60
83625
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
2/28/57
625.16
(Transferee of Fortruck 1400 Molds, Inc.)
6/30/57
285.21
83626
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
1/31/56
5,055.57
(Transferee of Freighter 315 Molds, Inc.)
1/31/57
5,417.91
6/30/57
3,384.28
83627
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
(Transferee of Futura 1210 Molds, Inc.)
6/30/57
1,985.01
83628
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
3/31/56
2,295.96
(Transferee of Starfire Molds, Inc.)
3/31/57
3,718.92
83629
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
(Transferee of Stiletto 259 Molds, Inc.)
6/30/57
1,047.18
83630
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
2/28/55
3,337.19
(Transferee of Stratojet Molds, Inc.)
2/29/56
5,358.98
2/28/57
5,343.86
6/30/57
1,104.77
83631
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
3/31/55
1,546.86
(Transferee of Submarine Molds, Inc.)
3/31/56
3,346.40
3/31/57
3,936.57
6/30/57
730.23
83632
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
(Transferee of The Royle Co.)
12/31/55
407.54
83633
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
2/28/57
5,417.91
(Transferee of Tanker 322 Molds, Inc.)
6/30/57
3,613.80
83634
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
12/31/55
1,018.25
(Transferee of Thunderstreak 215 Molds, Inc.)
12/31/56
3,402.61
6/30/57
44.19
83635
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
5/31/56
5,358.98
(Transferee of Miniature Masterpiece, Inc.)
5/31/57
5,417.91
83636
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
12/31/55
1,237.22
(Transferee of Liberator 218 Molds, Inc.)
12/31/56
5,141.76
83637
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
(Transferee of Maria 336 Molds, Inc.)
6/30/57
5,417.91
83638
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
(Transferee of Helicopter 214 Molds, Inc.)
2/28/57
5,417.91
83639
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
3/31/56
144.19
(Transferee of Hobby Paints and Cements, Inc.)
3/31/57
2,048.91
6/30/57
558.87
83640
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
2/28/55
3,798.67
(Transferee of Inter-Con Molds, Inc.)
2/29/56
5,358.98
2/28/57
5,417.91
6/30/57
1,055.51
83641
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
12/31/55
1,864.54
(Transferee of Mitchell Bomber 216 Molds, Inc.)
12/31/56
4,424.32
83642
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
(Transferee of Neptune 239 Molds, Inc.)
6/30/57
772.84
83643
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
11/30/56
5,358.98
(Transferee of Norton 331 Molds, Inc.)
6/30/57
5,417.91
83644
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
10/31/55
5,260.87
(Transferee of P. T. Boat Molds, Inc.)
10/31/56
5,358.98
83645
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
(Transferee of Roblee 328 Molds, Inc.)
6/30/57
921.03
83646
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
(Transferee of Sabre 236 Molds, Inc.)
1/31/57
2,434.86
83647
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
7/31/56
1,261.38
(Transferee of Scorpion 221 Molds, Inc.)
6/30/57
1,593.25
83648
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
(Transferee of Seamaster 244 Molds, Inc.)
6/30/57
4,586.43
83649
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
9/30/56
5,358.98
(Transferee of Sea Transport 329 Molds, Inc.)
6/30/57
4,171.44
83650
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
10/31/56
5,358.98
(Transferee of Secki 223 Molds, Inc.)
6/30/57
412.53
83651
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
2/28/57
5,417.91
(Transferee of Shooting Gallery Molds, Inc.)
6/30/57
4,109.12
83652
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
11/30/55
5,086.21
(Transferee of Skyrocket 213 Molds, Inc.)
11/30/56
5,358.98
6/30/57
1,993.69
83653
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
(Transferee of Skywarrior 241 Molds, Inc.)
6/30/57
668.65
83654
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
(Transferee of Tiger 249 Molds, Inc.)
6/30/57
1,739.19
83655
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
3/31/57
2,651.48
(Transferee of Toy Truck Molds, Inc.)
6/30/57
3,114.32
83656
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
(Transferee of Tradewind 238 Molds, Inc.)
6/30/57
3,194.17
83657
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
10/31/55
5,260.87
(Transferee of Transport 219 Molds, Inc.)
10/31/56
5,358.98
6/30/57
3,031.81
83658
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
6/30/56
4,889.02
(Transferee of Tugboat 314 Molds, Inc.)
6/30/57
5,417.91
83659
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
(Transferee of Voodoo 231 Molds, Inc.)
2/28/57
5,417.91
83660
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
(Transferee of White 1402 Molds, Inc.)
1/31/57
40.20
83661
Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.)
12/31/56
1,658.06
(Transferee of Worth 1403 Molds, Inc.)
6/30/57
1,021.62
*188 Docket No. 83606, Revell, Inc. (formerly Precision Specialties) was continued at trial and the issues therein are not decided in this opinion. The only issue for decision is whether the respondent erred in allocating among the petitioners and certain other corporations in each of the years concerned the $25,000 surtax exemption, pursuant to section 129 of the Internal Revenue Code of 1939 and section 269 of the Internal Revenue Code of 1954. Findings of Fact Some of the facts are stipulated and are found as stipulated. Lewis Glaser, the petitioner in Docket No. 72061, resides at 608 South Amalfi Drive, Pacific Palisades, California. He and his wife, Royle L. Glaser, filed a joint Federal income tax return for the calendar year 1955 with the district director of internal revenue at Los Angeles, California. On or about February 2, 1955, Hot Rod Molds, Inc., a corporation organized under the laws of the State of California, was liquidated and dissolved. All of its assets were distributed to its shareholders, one of which was Glaser. The net fair *189 market value of the assets received by Glaser in this liquidation was $8,317.12. If any Federal income taxes were owing by Hot Rod Molds, Inc., at the time of its liquidation, Glaser would be liable therefor, together with interest provided by law, as transferee. The petitioners Royle Co., Destroyer Molds, Inc., Baltimore Molds, Inc., Submarine Molds, Inc., Starfire Molds, Inc., Missouri Molds, Inc., Cougar Molds, Inc., 307 Carrier Molds, Inc. and Revell, Incorporated, were corporations organized under the laws of the State of California. In order to avoid confusion of the aforementioned Revell, Incorporated, which is the petitioner in Docket No. 72067, with another corporation bearing the identical name of Revell, Incorporated, which is the petitioner in Docket Nos. 83609 through 83661, the former will be referred to as Revell and the latter as Revell (S.U.S.). Revell (S.U.S.) was incorporated under the laws of the State of California as S.U.S. 312 Molds, Inc., on January 7, 1955, having its address at 4223 Glencoe Avenue, Venice, California. On March 31, 1958, the name was changed to its present name, Revell, Incorporated. All of the corporations which are involved as transferors *190 in Docket Nos. 83609 through 83661 were incorporated under the laws of the State of California. All of them filed their Federal income tax returns for the years in issue with the district director of internal revenue, Los Angeles, California, on an accrual basis of accounting. All of the corporations were involved in the production or sale of plastic hobby kits or other plastic products. The stock of these corporations was owned largely by Glaser on the one hand and by Sol Kramer and his brother Lou Kramer, on the other. The Kramers entered the hobby business shortly after their graduation from high school. On November 5, 1932, they opened a retail store on the fringes of Baltimore's shopping district. From that time on they devoted themselves assiduously to understanding and learning the hobby industry. From this beginning in the retail end of the business they progressed into wholesale selling in 1934. Finally, in 1936 they entered the manufacturing end of the industry. During the period 1936 to 1943 they developed a line of hobby kits encompassing almost all segments of the industry. They produced more than 200 different models. Their manufacturing plant contained approximately *191 25,000 square feet of floor space and employed about 85 people. Not only did they manufacture and market hobby kits but they also developed their own products and some of their own equipment. They marketed their products through most of the leading variety chains and toy wholesalers and sold to nearly all of the hobby wholesalers then in existence not only in the United States but throughout the world. In 1943 they sold this business. Sol went into the Marine Corps where he served until 1946. [3]
In 1946 Sol and Lou again entered the hobby industry. This time they confined their activities to the wholesale field. In less than three years they were well established and were generally regarded as the leading hobby jobbers in the United States. Sol was a member of the Board of Directors of the Hobby Industry Association from 1947 to 1953 or 1954. Sol and Lou engaged in all their enterprises in the hobby field as equal partners. Glaser graduated from high school in 1934. He earned his living by repairing radios from 1934 to 1938. In February *192 1938 he purchased a small radio repair shop which he operated as a sole proprietorship from that time until 1941. During this period, in addition to repairing radios he began to retail radios, records and appliances. In 1941 he took in Joseph Rabinowitch as a partner in the radio repair shop. In November 1941 Glaser entered the plastics business by establishing Precision Specialties, a sole proprietorship. Shortly thereafter Rabinowitch became a partner in this business. From 1941 to 1945 Precision Specialties fabricated various plastic items. It manufactured some aircraft and radio parts, but its business consisted primarily of making such consumer items as cigarette cases and women's compacts. In 1946 Precision Specialties was incorporated and a group of other investors acquired an ownership interest in it. However, this relationship did not work out satisfactorily; thus the corporation repurchased their interests later in 1946. In 1949 the corporation repurchased Rabinowitch's interest, leaving Glaser as the sole owner. In 1947 Precision Specialties began to manufacture its first plastic toy item, a toy washing machine. In 1948 two other toys were added as products. In 1948 *193 Glaser became acquainted with John Gowland, a toy designer from England. Gowland proposed that Precision Specialties manufacture two toys he had designed and market them under an agreement that he receive a 5 percent royalty. In 1950 Precision Specialties made a similar agreement with Gowland covering a toy modeled after the Maxwell automobile. This item proved to be very successful; almost 800,000 were sold in 1950. Gowland designed other similar automobiles but he desired to manufacture these himself. It was agreed that Precision Specialties would market these items. Under this arrangement, models of Ford, Packard and Cadillac automobiles were marketed. These items sold in 1951 as unassembled kits, the parts being molded of plastic. In 1952 Gowland decided to offer some of the new products he designed through other distributors. Thereafter, Precision Specialties determined to develop new kits without Gowland. In March 1951 Glaser attended a toy show in New York, where he displayed some of the products of Precision Specialties. Among the items he displayed were the unassembled kits of automobile models. Sol Kramer had also gone to New York to cover the toy show. Although he and *194 his brother dealt only in hobby products and not in toys, he liked to know what was new in the toy industry. In the process of surveying the products exhibited at the show Kramer saw Precision Specialties' display. His attention was immediately drawn to the model automobile kits. He evidenced his interest in them and Glaser demonstrated them for Kramer. Kramer discussed these items with Glaser and suggested certain changes in packaging. He indicated that if these changes could be made and if a display he had suggested could be given him, he would order 1,000 dozen of each of the kit items. Glaser accepted this offer with great enthusiasm. Thereafter, Kramer purchased products from Precision Specialties from time to time. Precision Specialties lost money in 1951 in spite of its apparently successful entry into the hobby kit field. However, early in 1952 it appeared to Glaser that the business of Precision Specialties would ultimately prove quite successful. Glaser realized that the continued success of the business would depend on the continued development and production of successful products. Indeed, ideas had already been developed within Precision Specialties for new products. *195 However, after the losses the corporation suffered in 1951, it was in no position to make the investment needed for beginning production of the new items. Furthermore, its financial condition was poor and unattractive to new investors. As a result, Glaser decided to seek investment capital under a plan whereby the investor would be concerned only with the product in which he invested. Under this plan, a corporation would be formed to own the rights to the product involved. The investor would acquire 25 percent of the stock in the corporation and Glaser would acquire the remaining 75 percent. The investor would then loan to the corporation the amount of money necessary to buy the mold for the production of the product. The corporation would have the product manufactured and pay at standard industry rates for the manufacture. It would then sell at a standard markup to Precision Specialties, which would market the product. This standard markup would represent the profit to the corporation that paid for the mold. Glaser succeeded in finding several investors who were willing to advance money under this plan. On January 16, 1953, three corporations were formed, each to hold the investment *196 in a specific product. In each the investor purchased 25 percent of the stock. Two investors by the names of Corby and Altschuler advanced money to Toy Truck Molds, Inc. Corby loaned the corporation $12,500 and Altschuler advanced $8,500. J. Feldstein invested in Shooting Gallery Molds, Inc., loaning it $12,500. Finally, Hot Rod Molds, Inc., was backed by M. Rifkin, who loaned it $12,500. The products of all of these corporations were to be marketed by the corporation which had been known as Precision Specialties. Precision Specialties, which had been marketing products under the name Revell for some time, changed its name to Revell, Incorporated, on December 8, 1952. In February 1953 it moved to the address it occupied at the time of trial. Manufacturing was to be arranged for by another corporation, Play Products, Inc., under a manufacturing contract with the mold-owning companies. Play Products, Inc., was, during the years in issue, owned 50 percent or more by Glaser. Play Products, Inc., subcontracted the actual injection molding to other companies. Two of these companies were related by ownership to Revell. They were Venice Molding, Inc., formed January 16, 1953 [4] and owned *197 75 percent by Glaser and 25 percent by Paul D. Gatov, and Ezee Molding Company, formed in February 1952, a partnership owned equally by Glaser and Stephen J. Zorichak. In 1953 Gatov loaned $5,000 to Venice Molding, Inc. Zorichak loaned to and invested in Ezee Molding Company a total of $5,850 during 1952. Finally, Harvard Properties, Inc., was formed on December 13, 1954, to acquire certain real property and machinery which it leased to Revell and Venice Molding. It was owned 75 percent by Glaser and 25 percent by Gatov. Gatov had loaned $4,500 to it. Glaser had approached Sol Kramer when Kramer was in Los Angeles as early as June 1952 with a view to persuading him to invest money in some of the products he proposed to make. Kramer emphatically rejected the proposition that he invest any money in the manufacture of Glaser's products. However, he did become interested in discussing products that Glaser might produce and suggested to Glaser some other models he might consider. During the discussion Kramer became sufficiently interested in designing new products that *198 he told Glaser to call him in two or three days to talk further about it. Therefore, on June 27, 1952, Glaser called on Kramer at his hotel. Glaser still hoped to get some money from Kramer and thought that he might do so if he asked for only $5,000 instead of the $25,000 which he had originally hoped to get. Although Kramer indicated that he did not wish to invest any money, he did say that he would like to become associated in the production of products. He established certain conditions for his participation in the enterprise. The first condition was that no substantial capital contribution would be required of the Kramers. The second condition was that his time would not be subject to any demands so that he could spend as much or as little time on the business of the enterprise as he pleased. The third condition was that the enterprise be arranged so that there would be no possibility of loss to the Kramers. The final condition was that while Glaser would not be obliged to produce an item recommended by Kramer, Kramer would not be obliged to participate in any of which he did not approve. Kramer returned to Baltimore to discuss the proposition with his brother. Pursuant to these *199 discussions, Kramer, on behalf of himself and his brother, agreed to participate with Glaser in the design and production of hobby kits, subject to the conditions he had laid down. In determining what form the enterprise should take, Glaser had pointed out to Kramer that a separate corporation could be formed for each item produced pursuant to the agreement. Kramer wanted this form to be used because the hobby kit business is highly speculative since it depends on fads, and he did not wish to have a profit which might have accrued to him on one item exposed to a loss that might be sustained on another. Glaser originally proposed that a separate corporation be formed for each class of items as, for example, all model airplanes. Kramer, however, insisted on going further and forming a separate corporation for each item produced because he wished this added protection. The following corporations were formed or ultimately acquired by Glaser and the Kramers pursuant to their agreement: Date of
Date Stock Is-
Paid-in
Name
Incorporation
sued to Glaser
Capital
Baltimore Molds, Inc.
11/12/53
1/ 7/54
$1,000
Bison 235 Molds, Inc.
11/14/56
2/21/57
3,000
207 B-52 Bomber Molds, Inc.
6/ 2/54
8/16/54
5,000
Bounty 327 Molds, Inc.
3/ 8/56
8/30/56
3,000
Cabin Crulser Molds, Inc.
3/30/53
7/13/53
1,000
Canberra 230 Molds, Inc.
3/ 8/56
8/ 6/56
3,000
307 Carrier Molds, Inc.
6/ 2/54
8/16/54
5,000
Century 1203 Molds, Inc.
8/ 3/55
10/ 6/55
3,000
Chevy 1401 Molds, Inc.
11/ 7/55
1/18/56
3,000
Cobra 222 Molds, Inc.
8/ 3/55
10/18/55
3,000
Collectors' Kits, Inc.
7/24/53
8/28/53
1,000
Connie 245 Molds, Inc.
11/14/56
2/21/57
3,000
Cougar Molds, Inc.
3/30/53
7/13/53
1,000
Crusader 250 Molds, Inc.
8/10/56
4/ 1/57
$3,000
Cutlass Molds, Inc.
3/30/53
7/13/53
1,000
Cutter 338 Molds, Inc.
9/13/56
2/21/57
3,000
Delta 233 Molds, Inc.
2/16/56
7/17/56
3,000
Destroyer Molds, Inc.
11/12/53
1/ 7/54
1,000
Eastwind 337 Molds, Inc.
11/14/56
6/13/57
3,000
Fighter 251 Molds, Inc.
1/ 4/57
3/ 5/57
3,000
Flying Cloud 344 Molds, Inc.
1/ 4/57
6/13/57
3,000
Fortruck 1400 Molds, Inc.
3/ 8/56
7/17/56
3,000
Forrest 339 Molds, Inc.
3/10/56
4/ 5/57
3,000
Freighter 315 Molds, Inc.
8/ 3/55
10/18/55
3,000
Futura 1210 Molds, Inc.
2/16/56
9/28/56
3,000
Gun Molds, Inc.
2/16/56
4/ 4/56
3,000
Hellcopter 214 Molds, Inc.
3/15/55
3/18/55
3,000
Hercules 247 Molds, Inc.
11/14/56
6/13/57
3,000
Hobby Paints & Cements, Inc.
4/20/55
6/ 3/55
3,000
Inter-Con Molds, Inc.
3/ 5/54
4/22/54
5,000
Liberator 218 Molds, Inc.
1/ 7/55
4/11/55
3,000
Maria 336 Molds, Inc.
11/14/56
4/ 9/57
3,000
Miniature Masterpleces, Inc.
5/22/53
1/26/55
1,000
Missouri Molds, Inc.
3/30/53
7/13/53
1,000
Mitchell Bomber 216 Molds, Inc.
1/ 7/55
3/18/55
3,000
Neptune 239 Molds, Inc.
1/ 4/57
6/13/57
3,000
Norton 331 Molds, Inc.
2/16/56
9/28/56
3,000
Pirate 1007 Molds, Inc.
3/ 8/56
9/28/56
3,000
P. T. Boat Molds, Inc.
11/12/53
1/ 7/54
1,000
Roblee 328 Molds, Inc.
8/ 7/56
8/27/56
3,000
The Royle Co.
2/ 2/51
3/ 2/54
5,000
Sabre 236 Molds, Inc.
2/16/56
9/28/56
3,000
Scorpion 221 Molds, Inc.
8/ 3/55
10/17/55
3,000
Sea Transport 329 Molds, Inc.
2/16/56
8/24/56
3,000
Seamaster 244 Molds, Inc.
2/16/56
9/28/56
3,000
Secki 223 Molds, Inc.
11/ 7/55
1/18/56
3,000
Shooting Gallery Molds, Inc.
1/16/53
5/29/53
1,000
Sky Hawk 232 Molds, Inc.
3/ 8/56
8/30/56
3,000
Sky Warrior 241 Molds, Inc.
1/ 4/57
4/ 2/57
3,000
Squirrel 1900 Molds, Inc.
11/14/56
6/13/57
3,000
Starfire Molds, Inc.
3/30/53
7/13/53
1,000
Stiletto 259 Molds, Inc.
1/ 4/57
6/13/57
3,000
Stratojet Molds, Inc.
3/ 5/54
4/22/54
5,000
Submarine Molds, Inc.
3/30/53
7/13/53
1,000
Sunliner 1202 Molds, Inc.
5/ 6/55
8/ 3/55
3,000
S.U.S. 312 Molds, Inc.
1/ 7/55
4/11/55
3,000
Tanker 322 Molds, Inc.
3/ 8/56
8/ 6/56
3,000
Thunderstreak 215 Molds, Inc.
1/ 7/55
3/18/55
3,000
Tiger 249 Molds, Inc.
11/14/56
5/ 6/57
3,000
Toy Truck Molds, Inc.
1/16/53
4/28/53
1,000
Tradewind 238 Molds, Inc.
9/13/56
2/21/57
3,000
Transport 219 Molds, Inc.
1/ 7/55
4/11/55
3,000
Tugboat 314 Molds, Inc.
7/15/55
10/17/55
3,000
Voodoo 231 Molds, Inc.
3/ 8/56
8/24/56
3,000
White 1402 Molds, Inc.
2/16/56
8/24/56
3,000
Worth 1403 Molds, Inc.
1/13/56
4/ 4/56
3,000
*200 Although there were some variations with respect to certain items, in general the relationship between the Kramers and Glaser took the following form: A product would be proposed for production. It would be discussed by various people, including Kramer and Glaser, Gatov who handled financial matters for the Glaser corporations, and design and production employees of Revell. If it was decided that the item might be suitable for production, further steps were taken. Research would be done on the item in order to be sure that the model would be as authentic as possible. The next step would be to prepare a preliminary model. This would be prepared by Revell's employees. It would then be sent to Sol Kramer, along with the research material. He would consider the item from every point of view. Then he would check it, part by part, for authenticity. Finally, he would report any improvements or modifications desired to Revell's chief engineer. After all modifications were agreed to, a mold would be ordered. This was ordered by Revell on its own stationery and was billed to Revell. The making of the mold would usually take several months. During this period a corporation would be formed *201 for the purpose of owning the mold. This corporation would be owned 75 percent by Glaser and 25 percent by the Kramers, or their nominee. Upon delivery of the mold, its cost would be charged upon Revell's books to the mold owning corporation, but if the mold was manufactured by Play Products, it would charge the mold owning corporation directly instead of billing Revell. After June 30, 1954, the costs of preliminary development of the model would be similarly charged to the mold owning company by Revell; prior to this date Revell had absorbed these expenses. The design of the product and the instruction sheet for assembly were frequently copyrighted by Revell by the benefit of the mold owning companies. When the mold was delivered and manufacturing arranged for by a contract between the mold owning company and Play Products, it was necessary to develop an instruction assembly sheet. This was an important part of the product, and Sol Kramer participated to a great degree in the process. The employees of Revell would develop a proposed instruction sheet. Kramer would take the items in the kit and attempt to assemble them from this instruction sheet. If he felt that any part of the *202 assembly process would prove difficult for a child of 8 or 9 years of age, he would require that the process be simplified. Finally, he would recommend any changes in the instruction sheet that he deemed necessary. Sol Kramer also determined how the item would be packaged and displayed. He chose the colors for the package and the scenes to be portrayed on it, with a view to creating a buying impulse in the potential customer. When all of these things were done, the product was ready to be manufactured and marketed. The mold owning company would order items through Play Products pursuant to a standard manufacturing agreement. It would sell them to Revell pursuant to a standard sales agreement. Separate purchase and sales orders were made up for each of these transactions. All of the mold owning corporations used the same style of printed forms for this purpose. The mold owning corporations did not hold title to any inventory but did hold accounts receivable from Revell. Each of the mold owning corporations maintained a bank account and the following accounting records: Cash receipts records, cash disbursements records, purchases and sales journals, general journal and a general *203 ledger. The mold owning companies did not maintain any subsidiary ledgers or journals. The mold owning corporations maintained the same address as did Revell and Play Products. No specific portion of the premises was set aside for the use of any one of them. They did not maintain telephones. During the years in issue each of the mold owning companies paid Revell at least $50 for the administrative functions performed for them by Revell and for the space that they occupied. Until December 31, 1956, all of the mold companies paid Glaser $100 a month. After that date this sum was paid to Revell instead of Glaser, making a total of $150 a month paid by each of the mold companies to Revell. Gatov received 5 percent of the net profit of each company before Federal and State income taxes. The Kramers were paid $50 and 1 2/3 percent of the net profits before Federal and State income taxes by each mold owning company each month. In addition, the Kramers occasionally received consulting fees from these corporations. The mold owning companies had no employees other than their officers and directors. They were as follows: Directors
Officers
Lewis Glaser
President - Lewis Glaser
Royle Glaser
Vice President - Royle Glaser
Paul Gatov (until December 1956)
Secretary - Treasurer - Paul Gatov (until De-
Horace Ruderman (from December 1956
cember 1956)
until date of merger into S.U.S. 312
Horace Ruderman (from December 1956 until
Molds, Inc.)
date of merger into S.U.S. 312 Molds, Inc.)
*204 A few of the corporations whose tax liability is in question did not operate according to the pattern described for mold owning companies. Miniature Masterpieces, Inc., never owned any molds. It purchased kits from unrelated manufacturers and sold directly to the trade until 1955, when it commenced selling exclusively to Revell. The Royle Co. sold products to an unrelated company, not to Revell. Collectors' Kits, Inc., purchased kits from an unrelated manufacturer in 1953 and 1954 and sold directly to the trade until late 1954. After 1954 it purchased from Play Products and sold exclusively to Revell. After June 30, 1956, it supplied mold companies with manufactured kits in New Jersey and performed shipping and warehousing services for Revell. Hobby Paints & Cements, Inc., did not own molds. Although the great majority of the mold owning companies held only one mold, a few held more. In some of these cases one company would hold more than one mold for making the same product. In other cases, a mold originally designed to make one product was modified somewhat to produce another similar item. Revell-AMT, Inc., held a number of molds. It was originally a corporation owned by Glaser *205 together with one Gallogly which marketed products produced by molds owned by Gallogly through another corporation. On or about July 1, 1956, Glaser acquired Gallogly's interest in Revell-AMT, Inc., and the corporation acquired three molds of products that it had been marketing. Glaser sold 25 percent of this corporation to the Kramers. Thereafter it acquired molds for making three or four other items. Missouri Molds, Inc., also held molds for more than one item. In addition to the modification of the Missouri mold which was used to produce a replica of the New Jersey, it also held the molds used to produce H.O. trains. The Kramers had been particularly anxious to begin production of H.O. gauge electric trains. However, these trains were items of greater complexity, presenting many more production engineering problems than any of the items that were previously produced by Glaser and the Kramers. The preproduction costs were expected to, and did, amount to a great deal more than with other items. The products of Missouri Molds, Inc., had been extremely successful. Thus, it had a large accumulated earnings account and liquid assets. In view of these facts, it was agreed between Glaser *206 and the Kramers that the H.O. train project would be placed in that corporation in order to provide a source of funds to bear development costs. For the most part, however, the Kramers insisted on maintaining the arrangement of one corporation for each item to protect their profit on one item from any loss on another. On one occasion, Grey, an employee of Revell, proposed to Glaser that an attempt be made to place more than one airplane mold * in one corporation. Glaser agreed to this and a mold for another airplane was transferred to Cutlass Molds, Inc. When the Kramers received the memorandum stating that this had been done they objected strongly. Sol Kramer informed Glaser that unless the other molds were retained in separate corporations he would not continue their relationship. Gatov, who was responsible for the accounting records of the corporate group, continually tried to convince Sol Kramer to limit the number of corporations in order to reduce the accounting burden, but the Kramers continued to insist that each mold have its own corporation. *207 Revell obtained much of its working capital during the years in issue by transferring its accounts receivable with recourse to the Bank of America. The bank required that the mold owning companies guarantee repayment of the sums advanced by the bank under the arrangement. However, the bank would advance only 80 percent of the face amount of accounts transferred and 20 percent was held in a reserve account by the bank. Furthermore, Revell's bad debt experience was only about one-half of one percent of sales. Thus, there was no substantial risk of loss to the mold companies in connection with their guarantees. The mold corporations also guaranteed an unsecured loan of $100,000 in 1954 and $150,000 in 1956. In view of the fact that there were substantial amounts held by the bank as reserves against the accounts receivable they had taken, there was relatively little risk involved in the guarantee of these loans. The mold companies did guarantee a loan of $750,000 obtained in March 1957 from another bank, but that was after all of the corporations involved here were incorporated and at a time when arrangements for merger of all of the corporations was under discussion. Many of the corporations *208 of the related group had losses during the years in issue. Some of them had losses in successive years. For example, Shooting Gallery Molds, Inc., had losses of $930.68, $9,858.99 and $30,164.44 in the years 1954, 1955 and 1956. Toy Truck Molds, Inc., had losses of $5,077.52, $13,058.73 and $5,625.72 in the same years. Collectors' Kits, Inc., had losses of $10,463.26 and $13,455.45 in 1955 and 1956, respectively. Fifteen of the corporations to which the respondent has allocated the surtax exemption sustained losses in 1957. These losses could not be deducted from the gains of other corporations; their deductibility depended on the availability of income in a carry-back, or carryover year. Glaser was aware of this tax disadvantage at the time most of the corporations involved herein were formed. During the taxable year 1945 Precision Specialties, while being operated as a partnership, had substantial income. Glaser did not have funds available to pay the tax due on his share of the income. In the taxable year 1946, when Precision Specialties was operating as a corporation, it realized a substantial loss. Nonetheless, Glaser had to continue paying his 1945 tax liability because the *209 corporate loss could not be set off against the partnership income. A similar situation occurred in the years 1951 and 1952. In 1951 Precision Specialties realized substantial income and did not have sufficient funds available to pay its tax. However, in this instance the same taxable entity, Precision Specialties, had a large loss in 1952. Thus, in this instance the loss in the subsequent year wiped out the remaining tax liability for 1951. Therefore, prior to the formation of most of the corporations involved here, Glaser had experienced the tax disadvantages of dealing through multiple taxable entities. In early 1957 the corporate group controlled by Glaser and Kramer needed funds to continue its production plans. Glaser informed Sol Kramer that to be in a position to obtain adequate financing it would be necessary to merge all of the mold owning companies, the sales companies and the manufacturing companies, into one corporate entity. Glaser had an additional reason for wishing such a merger; in early 1957 he was considering obtaining the needed funds by making a public offering of stock in the entire enterprise. Kramer reluctantly agreed that all of the corporations could be *210 merged because he believed a merger would be necessary to obtain the financing that would be required. There was a tentative agreement that the Kramers would be allowed to buy sufficient stock in the corporation resulting from the merger to acquire a 25 percent interest in it. Such a purchase was necessary if the Kramers were to have a 25 percent interest because Glaser owned stock in some of the corporations to be merged in which the Kramers owned no stock. Because of this aspect of the agreement, the merger took place in two steps. On June 20, 1957, a merger agreement was entered under which the following corporations were merged into S.U.S. 312 Molds, Inc.: Baltimore Molds, Inc. Bison 235 Molds, Inc. 207 B52 Bomber Molds, Inc.
Bounty 327 Molds, Inc.
Cabin Crusier Molds, Inc. Canberra 230 Molds, Inc. 307 Carrier Molds, Inc. Century 1203 Molds, Inc. Chevy 1401 Molds, Inc. Cobra 222 Molds, Inc. Connie 245 Molds, Inc. Cougar Molds, Inc. Crusader 250 Molds, Inc. Cutlass Molds, Inc. Cutter 338 Molds, Inc. Delta 233 Molds, Inc. Destroyer Molds, Inc. Eastwind 337 Molds, Inc. Fighter 251 Molds, Inc. Flying Cloud 344 Molds, Inc. Fortruck 1400 Molds, *211 Inc. Forrest 339 Molds, Inc. Freighter 315 Molds, Inc. Futura 1210 Molds, Inc. Gun Molds, Inc. Helicopter 214 Molds, Inc. Hercules 248 Molds, Inc. Hobby Paints & Cements, Inc. Inter-Con Molds, Inc. Liberator 218 Molds, Inc. Maria 336 Molds, Inc. Missouri Molds, Inc. Mitchell Bomber 216 Molds, Inc. Neptune 239 Molds, Inc. Norton 331 Molds, Inc. Pirate 1007 Molds, Inc. P. T. Boat Molds, Inc. Roblee 328 Molds, Inc. Sabre 236 Molds, Inc. Scorpion 221 Molds, Inc. Seamaster 244 Molds, Inc. Sea Transport 329 Molds, Inc. Secki 223 Molds, Inc. Shooting Gallery Molds, Inc.
Sky Hawk 232 Molds, Inc.
Skyrocket 213 Molds, Inc.
Skywarrior 241 Molds, Inc.
Squirrel 1900 Molds, Inc.
Starfire Molds, Inc.
Stiletto 259 Molds, Inc.
Stratojet Molds, Inc. Submarine Molds, Inc. Sunliner 1202 Molds, Inc. Tanker 322 Molds, Inc. Thunderstreak 215 Molds, Inc. Tiger 249 Molds, Inc. Toy Truck Molds, Inc. Tradewind 238 Molds, Inc. Transport 219 Molds, Inc. Tugboat 314 Molds, Inc. Voodoo 231 Molds, Inc. White 1402 Molds, Inc. Worth 1403 Molds, Inc. No agreement was ever reached between Glaser and the Kramers for the purchase of *212 additional shares of stock by the Kramers. Nevertheless, on March 20, 1958, an agreement was entered for the merger of the following corporations into S.U.S. 312 Molds, Inc.: Revell, Incorporated Harvard Properties, Inc. Venice Molding, Inc.
Play Products, Inc. Miniature Masterpieces, Inc. The Royle Co. Collectors' Kits, Inc. The Kramers owned an interest of approximately 18 percent in the corporation resulting from these mergers. In 1957 the respondent issued notices of deficiency for 1954 to 16 of the related corporations which allocated the $25,000 corporate surtax exemption among those corporations under the authority of sections 15(c) and 129 of the Internal Revenue Code of 1939 and sections 1551 and 269 of the Internal Revenue Code of 1954. Revell (S.U.S.), as transferee of the 15 other corporations, paid the asserted deficiency with respect to one of them, filed an appropriate claim for refund and brought suit in the Court of Claims. The Government obtained the dismissal of this suit by refunding the taxes paid together with interest. On August 14, 1959, * the respondent issued another notice of deficiency to Revell (S.U.S.) which, *213 among other adjustments, allocated the income of many of the corporations involved in this case to Revell (S.U.S.) pursuant to sections 61(a) and 482 of the Internal Revenue Code of 1954. Revell (S.U.S.) petitioned the Tax Court to redetermine the deficiency asserted in this notice. The respondent, in an amended answer to this petition, admitted its allegations and before a Motions Calendar of the Tax Court heard November 9, 1960, sought and obtained a judgment of no deficiency and no overpayment, with respect to this notice, based upon his admissions of error contained in the amended answer. Finally, trial of the present case was held by this Court based on the notices of deficiency issued in 1957, with the exception of the notice involved in the case before the Court of Claims. The present proceeding also involves a number of other notices of deficiency dealing with taxable years after 1954. In the notices of deficiency involved here, the respondent determined that the stock of the corporations which *214 merged into S.U.S. 312 Molds, Inc., on June 20, 1957, and March 20, 1958, was acquired for the principal purpose of evasion or avoidance of Federal income taxes, and pursuant to the authority of section 269(b) of the Internal Revenue Code of 1954 allocated the corporate surtax exemption among various corporations as follows: Surtax Exemption Allocations for Fiscal or Calendar Years Ending in or on 1/1/57-
Name of Corporation
1954
1955
1956
6/29/57
6/30/57
Baltimore Molds, Inc.
X
X
X
X
Bison 235 Molds, Inc.
X
207 B-52 Bomber Molds, Inc.
X
X
X
X
Bounty 327 Molds, Inc.
X
X
Cabin Cruiser Molds, Inc.
X
X
X
X
X
Canberra 230 Molds, Inc.
X
X
307 Carrier Molds, Inc.
X
X
X
X
Century 1203 Molds, Inc.
X
X
Chevy 1401 Molds, Inc.
X
X
Cobra 222 Molds, Inc.
X
X
Connie 245 Molds, Inc.
X
Cougar Molds, Inc.
X
X
X
X
X
Crusader 250 Molds, Inc.
X
Cutlass Molds, Inc.
X
X
X
X
X
Cutter 338 Molds, Inc.
X
Delta 233 Molds, Inc.
X
X
Destroyer Molds, Inc.
X
X
X
X
Eastwind 337 Molds, Inc.
X
Fighter 251 Molds, Inc.
X
Flying Cloud 344 Molds, Inc.
X
Fortruck 1400 Molds, Inc.
X
X
Forrest 339 Molds, Inc.
X
Freighter 315 Molds, Inc.
X
X
X
Futura 1210 Molds, Inc.
X
X
Gun Molds, Inc.
X
X
Helicopter 214 Molds, Inc.
X
X
X
Hercules 247 Molds, Inc.
X
Hobby Paints & Cements, Inc.
X
X
X
Hot Rod Molds, Inc.
X
Inter-Con Molds, Inc.
X
X
X
X
Liberator 218 Molds, Inc.
X
X
X
Maria 336 Molds, Inc.
X
Miniature Masterpieces, Inc.
X
X
Missouri Molds, Inc.
X
X
X
X
Mitchell Bomber 216 Molds, Inc.
X
X
X
Neptune 239 Molds, Inc.
X
Norton 331 Molds, Inc.
X
X
Pirate 1007 Molds, Inc.
X
X
P.T. Boat Molds, Inc.
X
X
X
X
Roblee 328 Molds, Inc.
X
The Royle Company
X
X
X
X
Sabre 236 Molds, Inc.
X
X
Scorpion 221 Molds, Inc.
X
X
Seamaster 244 Molds, Inc.
X
X
Sea Transport 329 Molds, Inc.
X
X
Secki 223 Molds, Inc.
X
X
Shooting Gallery Molds, Inc.
X
X
X
X
X
Sky Hawk 232 Molds, Inc.
X
X
Skyrocket 213 Molds, Inc.
X
X
X
Sky Warrior 241 Molds, Inc.
X
Squirrel 1900 Molds, Inc.
X
Starfire Molds, Inc.
X
X
X
X
X
Stiletto 259 Molds, Inc.
X
Stratojet Molds, Inc.
X
X
X
X
Submarine Molds, Inc.
X
X
X
X
X
Sunliner 1202 Molds, Inc.
X
X
X
S.U.S. 312 Molds, Inc.
X
X
X
Tanker 322 Molds, Inc.
X
X
Thunderstreak 215 Molds, Inc.
X
X
X
Tiger 249 Molds, Inc.
X
Toy Truck Molds, Inc.
X
X
X
X
Tradewind 238 Molds, Inc.
X
Transport 219 Molds, Inc.
X
X
X
Tugboat 314 Molds, Inc.
X
X
Voodoo 231 Molds, Inc.
X
X
White 1402 Molds, Inc.
X
X
Worth 1403 Molds, Inc.
X
X
Collectors' Kits, Inc.
X
X
X
Revell, Incorporated
X
X
X
X
Total Fractional Allocations
16
23
39
26
67
*215 The principal purpose for the formation of the numerous corporations involved in this case was the establishment of the relative rights of their owners in the business, and not the evasion or avoidance of Federal income taxes. Opinion The respondent has determined that the principal purpose of the formation of the numerous corporations involved here was the evasion or avoidance of Federal income taxes and, on the basis of this determination, seeks to allocate the $25,000 corporate surtax exemption among the various corporations involved in each of the years at issue, pursuant to the provisions of section 269(b) of the Internal Revenue Code of 1954. [5] The respondent contends that the petitioner-corporations taken together represent a single business enterprise and that the principal purpose for dividing that enterprise into a number of corporations was to avoid Federal income taxes by obtaining a number of corporate surtax exemptions. The petitioners contend that tax avoidance was not the principal purpose for the formation of the numerous corporations involved in this case. *216 The question for decision, then, is whether the petitioners have established by a preponderance of the evidence that a tax avoidance purpose did not exceed in importance any other purpose. Section 1.269-3, Income Tax Regs.; Commodores Point Terminal Corporation, 11 T.C. 411 (1948). This is a question of fact to be determined upon the consideration of the entire record. The attorneys for both parties have thoroughly presented all the facts from which a tax avoidance or other purpose might be inferred, and they have pointed out on brief all of the inferences which might be drawn from the evidence presented. Upon consideration of the entire record, we believe that the determination we are required to make is a close one indeed. It is evident that both Glaser and the Kramers were astute businessmen with considerable familiarity with Federal income taxes. We are convinced that considerations of the income tax results of their transactions were an important factor in the establishment of the corporate structure through which they operated their enterprises. *217 However, upon weighing the evidence presented, we find that it was not their principal purpose. It would be useless and perhaps impossible to analyze all of the factors in the evidence that lead us to this conclusion. In reaching this result, we have given considerable weight to several factors. We deem it significant that the procedure of forming one corporation for one product was used by Glaser for the purpose of establishing the relative interests of several independent investors prior to the formation of corporations with the Kramers. Further, we considered the fact that Glaser was aware of the serious tax disadvantages of a multiple corporate structure in that losses of one corporation could not be set off against the gains of another. We also find of considerable importance the extreme efforts of the Kramers to avoid any monetary risk both with respect to their pre-existing capital and the profits of the corporations to which they might be entitled. Finally, we accord substantial weight to the direct testimony of the witnesses with regard to their intentions because of the nature of their testimony and the manner in which it was given. Decisions will be entered under Rule *218 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Destroyer Molds, Inc., Docket No. 72058; Baltimore Molds, Inc., Docket No. 72059; Submarine Molds, Inc., Docket No. 72060; Lewis Glaser, Docket No. 72061; Starfire Molds, Inc., Docket No. 72063; Missouri Molds, Inc., Docket No. 72064; Cougar Molds, Inc., Docket No. 72065; 307 Carrier Molds, Inc., Docket No. 72066; Revell, Incorporated, Docket No. 72067; Revell, Incorporated (Formerly S.U.S. 312 Molds, Inc.,) Docket Nos. 83609, 83610, 83611, 83612, 83613, 83614, 83615, 83616, 83617, 83618, 83619, 83620, 83621, 83622, 83623, 83624, 83625, 83626, 83627, 83628, 83629, 83630, 83631, 83632, 83633, 83634, 83635, 83636, 83637, 83638, 83639, 83640, 83641, 83642, 83643, 83644, 83645, 83646, 83647, 83648, 83649, 83650, 83651, 83652, 83653, 83654, 83655, 83656, 83657, 83658, 83659, 83660, 83661.↩
2. By amended answer filed February 10, 1961, respondent reduced this amount to approximately $5,900.↩
3. Of the Kramers, only Sol testified at the trial of this case. Therefore, the record does not show Lou's activities between 1943 and 1946.↩
4. The stipulation filed by the parties gives this date as 1955, but this appears to be a typographical error.↩
*. By official order of the Tax Court dated July 17, 1963 and signed by Judge Fay↩, the words "more than one airplane mold" were substituted for "all of the airplane molds" and "Cutlass" was substituted for "Cougar".
*. By official order of the Tax Court dated July 17, 1963 and signed by Judge Fay↩, the present wording was substituted for the words "Early in 1958".
5. The respondent on brief made no attempt to support the allocation made by him under the provisions of sec. 1551, I.R.C. 1954, formerly sec. 15(c), I.R.C. 1939↩.